**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Farmers Insurance Company of Arizona, et al., | No. CV-21-01390-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| DNS Auto Glass Shop LLC, et al., | |
| Defendants. | |

Plaintiffs assert a variety of claims against Defendants for submission of allegedly misleading insurance claims. Doc. 1. Defendants counterclaim for breach of contract and similar claims. Doc. 28. Defendants move for summary judgment on several of Plaintiffs' claims. Doc. 160. Plaintiffs move to preclude Defendants' expert witness Gary Hart and for partial summary judgment on the counterclaims. Doc. 158. The Court heard oral argument on both motions on February 27, 2024. For reasons stated below, the Court will grant in part and deny in part each motion.

**I.   Background.**

Plaintiffs sue Defendants DNS Auto Glass Shop LLC, d/b/a Express Glass Works and Glass Replacements, Excellent Auto Glass, LLC, Right at Home Glass, LLC, Auto Glass Shop, LLC, and Glass Replacements, LLC ("Defendants").[1]  Doc. 1.  These entities

---

[1] Plaintiffs also bring claims against Defendant Auto Glass Holdings and individuals Jeff Searles, Mark Feuer, and Scott Taylor. Claims against these individuals are not at issue in either motion.

are engaged in the auto glass repair and replacement business, and Plaintiffs provide insurance coverage for such services. *Id.* ¶¶ 28-34.

When an insured party approaches a Defendant about a glass repair or replacement, Defendants call Plaintiffs to verify insurance coverage and begin the claims process. This phone call is referred to as the First-Notice-of-Loss call ("FNOL call"). Plaintiffs gather information from the insured during the call, including name, address, phone number, vehicle information, and the insured's damages. Plaintiffs enter this information into their own internal system, and Safelite, a third-party vendor, creates a claim file for the customer within Plaintiffs internal claim system. On occasion, Plaintiffs perform inspections of vehicles before authorizing Defendants to start work. Docs. 161 ¶¶ 11-16, 170 ¶ 4.

Defendants use e-Direct Glass ("eDG") software, developed by Defendants' expert Gary Hart, to process insurance claims internally. Defendants input information for each claim including the name and address of the insured, vehicle information, date of loss, policy information, and the glass service location. The eDG system connects to Safelite's system to provide Plaintiffs with the information necessary to process the insurance claim. Safelite is responsible for providing Plaintiffs with the claim information, for collecting payment, and for sending payment to Defendants. Docs. 161 ¶¶ 17-22, 170 ¶ 4.

In each of the almost 3,000 claims at issue in this case, Defendants provided a Florida phone number during the FNOL call and provided a Florida phone number and address on their invoices and work orders. Doc. 1 ¶ 38. Defendants did not tell Plaintiffs during the calls that the repairs were occurring in Florida, and did provide some Arizona-based information in their claims submitted to Plaintiffs. Docs. 161 ¶ 25, 170 ¶ 6, 21.

During the relevant time, Defendants performed glass repair services in Arizona. They maintained physical offices in both Florida and Arizona. Defendant Glass Replacements completed approximately 97% of the glass repairs at issue and Defendant Right at Home Glass performed the rest. Both Glass Replacements and Right at Home Glass are registered to do business in Florida and Arizona. Both maintain Florida addresses and phone numbers. Docs. 161 ¶ 2-10, 170 ¶ 2.

Plaintiffs allege that they were misled into overpaying Defendants on at least 2,910 claims between 2018 and 2020. Doc. 1 ¶¶ 41-42. Plaintiffs allege that Defendants are knowledgeable about the auto glass replacement industry, know that insurers typically pay claims based on the glass shop address and phone number, knew that Florida claims are paid at a higher rate than Arizona claims, and chose to provide Florida-based addresses and phone numbers in order to cause Plaintiffs to pay higher prices. Doc. 170 ¶ 6.

On April 25, 2018, Plaintiffs' counsel Steven Kluz sent cease-and-desist letters to Defendants alerting them to this issue. The letters requested that Defendants begin using an Arizona phone number and billing information to prevent overpayment. Defendants declined to change their practice, and Plaintiffs now manually change Defendants geographic location in their own system. Doc. 170 ¶¶ 34, 36. Defendants admit the relevant work was performed in Arizona for each of the claims at issue in this case, but deny that they represented to Plaintiffs that it was performed in Florida or that they were overpaid by Plaintiffs. Doc. 28 at 6, 9.

Plaintiffs assert claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. §§ 1964(c) and 1962(c) (Count I), § 1962(a) (Count II), and § 1962(d) (Count III). Doc. 1 ¶¶ 47-81. Plaintiffs also bring claims for fraud (Count IV), unjust enrichment (Count V), civil conspiracy (Count VI), and piercing the corporate veil (Count VII). *Id.* ¶¶ 82-117.

Defendants assert counterclaims for breach of contract, breach of duty of good faith and fair dealing, and unjust enrichment alleging that Plaintiffs have underpaid them a total of $408,637.01. They allege that when Plaintiffs began manually changing their location to Arizona, they began being paid below a fair and reasonable market rate for their work. Doc. 28 at 13-22.

**II.   Summary Judgment Standard.**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the court

of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and draw justifiable inferences in that party's favor, *Anderson*, 477 U.S. at 255.

## III.  Defendants' Summary Judgment Motion.

### A.  Fraud, Civil Conspiracy, and RICO Claims (Counts I-IV, VI).

In support of their fraud, civil conspiracy, and RICO claims, Plaintiffs allege that Defendants made fraudulent misrepresentations by using a Florida phone number during FNOL calls and by listing Florida numbers and addresses on work orders and invoices when glass repair services were actually performed in Arizona. Doc. 1 at 8-16.  Plaintiffs believe that Defendants knew they would receive a higher rate for repair services done in Florida and purposefully misrepresented their location to receive higher reimbursements.[2]

Defendants argue that they are entitled to summary judgment on these claims because Plaintiffs cannot establish that (1) Defendants made any false or misleading representations regarding where the glass repairs took place, (2) Defendants intended for Plaintiffs to process the claims as if the repairs were occurring in Florida, and (3) Plaintiffs reasonably relied on any such misrepresentations.  Doc. 160.  Plaintiffs respond that whether Defendants made fraudulent statements and whether Plaintiffs reasonably relied on those statements are questions properly reserved for the jury.  Doc. 169.

---

[2] Plaintiffs' expert Keith Beveridge suggests that insurance companies are willing to reimburse for work completed in Florida at a higher rate than other geographic areas because of Florida's one-way attorneys fee statute.  The statute awards legal fees to prevailing insureds who bring claims against their insurers.  Mr. Beveridge suggests that insurance companies often choose to reimburse at rates higher than fair market value in order to avoid disputes where they may be required to pay the legal costs of the opposing party. Doc. 170-1 at 11-12.

The Court will deny Defendants' motion to the extent it relies on insurance claims made prior to Plaintiffs April 25, 2018 cease-and-desist letter. The Court will grant Defendants' motion in all other respects.

### 1. Prior to Cease-and-Desist Letter.

To prevail on a fraud claim in Arizona, a plaintiff must show: (1) the defendant has made a representation; (2) its falsity; (3) its materiality; (4) the defendant's knowledge of its falsity or ignorance of its truth; (5) the defendant's intent that it should be acted upon in the manner reasonably contemplated; (6) the plaintiff's ignorance of its falsity; (7) the plaintiff's reliance on the statement; (8) the plaintiff's right to rely on the statement; and (9) the plaintiff's consequent and proximate injury. *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). "Direct proof of fraud . . . is not required. A party can meet its burden of proof by showing circumstantial evidence through which fraud may reasonably be inferred." *Premier Fin. Servs. v. Citibank (Arizona)*, 912 P.2d 1309, 1314 (Ariz. Ct. App. 1995). Because Plaintiffs' civil conspiracy and RICO claims arise from the same allegedly fraudulent misstatements, if summary judgment is granted on fraud, it will also be granted on these claims.[3]

Defendants argue that Plaintiffs are unable to prove Defendants made a false representation because both Glass Replacements and Right at Home Glass, the entities who handled the claims in question, are businesses who do glass repair in Florida and Arizona. Doc. 160 at 12. Because both use a Florida location as their corporate headquarters, Defendants say the billing information was accurate.

Defendants also argue that Plaintiffs cannot prove Defendants intended for Plaintiffs to believe the glass repair work was being done in Florida. Doc. 160 at 13. They offer substantial evidence showing their attempts to notify Plaintiffs where repair work was

---

[3] Defendants also argue that Plaintiffs' civil RICO claims are inappropriate because RICO was never intended to apply to ordinary business disputes. Doc. 160 at 15-16. The Court is not persuaded. None of the cases Defendants cite rested on this ground. Courts in each of Defendants' cases found that plaintiffs had not sufficiently pled an element of their claim. *See* Doc. 161 at 11. The language Defendants rely on appears to be explaining why RICO requires elements like continuity and the existence of an enterprise. It does not exist as a separate basis for dismissing RICO claims.

5

done. To start, they note that Defendants informed Plaintiffs during the FNOL calls that service was being done at an Arizona service location, that the insured person was an Arizona resident, that the glass damage occurred in Arizona, and in some instances that the Florida information was solely for billing purposes and was not indicative of service location. At oral argument, counsel for Defendants highlighted FNOL call transcripts for two individuals to demonstrate Defendants' purported attempts at transparency.

During the FNOL call for Nancy Davis, the insured gives her home address in Mesa, Arizona, and provides a personal phone number with an Arizona area code. She confirms that she is located in Arizona. When Plaintiffs' representative notes that the provider looks to be based in Florida, Ms. Davis says that the Defendants' corporate office is in Florida, but that service will be done in Arizona. Doc. 161-13 at 12-18. In the FNOL call for Matthew Sewick, the insured indicates that he is an Arizona resident. When Plaintiffs' representative notes that the shop number is indicating a Maitland, Florida address, the representative asks the repair shop employee if there is an individual number for the Arizona shop. The employee indicates that the address and phone number for billing are separate from the shop address, which is in Mesa, Arizona. The employee then provides an Arizona phone number and address for the shop. Doc. 161-13 at 3-8. Defendants provided the Court with FNOL calls for five other individuals which follow a similar pattern. *See* Doc. 161-13 at 19-63.

Defendants also provide Plaintiffs' internal claim files to show Plaintiffs knew the repairs were occurring in Arizona. The claim files include a loss location and loss state of Arizona, an Arizona service location for the vehicle inspection, and that the insured is covered by "Farmers Insurance Company of Arizona[.]" Doc. 161-6. Similarly, Defendants note that Plaintiffs' vehicle inspection reports show Plaintiffs completed over 200 on-site inspections for Defendants' customers at Arizona service addresses, and that Defendants were providing Plaintiffs with glass purchase documents indicating they were working with Arizona dealers. Docs. 160 at 7-8, 161-14, 161-16.

Relying on the above facts, Defendants also argue that Plaintiffs cannot show it was reasonable for Plaintiffs to rely on the Florida information when determining the service location. Given the various ways they attempted to show where the service was occurring, Defendants argue it was unreasonable for Plaintiffs to look solely at the phone number and address to make this determination. Doc. 160 at 13-14. Defendants believe the fault lies with Plaintiff's internal system, which looks only to these items to determine service location. *See* Doc. 160 at 14, 174 at 6.

Although the facts recited by Defendants might have persuasive force with a jury, the Court does not find them sufficient for summary judgment. Defendants focus on the objective truth of their statements, arguing that because their headquarters has a Florida address and uses a Florida phone number, they are not making misrepresentations when they provide this information on FNOL calls. But "[w]hen one is asked a question that fairly calls for disclosure of a material fact, he or she commits fraud by concealing the truth or otherwise answering in a manner deliberately calculated to mislead." *Lerner v. DMB Realty, LLC*, 322 P.3d 909, 916 (Ariz. Ct. App. 2014). *See also* Restatement (Second) of Torts § 529 (1977) ("A statement containing a half-truth may be as misleading as a statement wholly false."). And Plaintiffs offer substantial evidence by which a reasonable jury could conclude that Defendants intentionally misled Plaintiffs as to where the glass replacements were occurring.

Plaintiffs offer evidence that it is common knowledge in the auto glass industry that insurance companies determine pricing based on the physical location of the auto glass shop and the shop's phone number. Plaintiffs' expert, Keith Beveridge, asserts in his report that "[i]t is well known in the auto glass industry that for years insurance companies paid regional pricing based upon the physical location of the auto glass shop and that shop's phone number." Doc. 170-1 at 13. Though Defendants' principal Jeff Searles maintains that he was unaware of this custom, a material dispute of fact exists as to whether this was a widely-accepted practice of which Defendants were aware. *See* Doc. 161-1 ¶ 28.

7

Plaintiffs maintain that they do not deal with any other auto glass companies that provide a phone number with an area code different from the service location, regardless of the location of their corporate headquarters. In fact, Plaintiffs allege that this practice is new for Defendants — that prior to 2018, Defendants used Arizona addresses and phone numbers for billing purposes and were reimbursed at Arizona rates. They contend that Defendants only began providing Florida information in 2018, after which they began receiving higher reimbursements from Plaintiffs. Doc. 170-2 at 70 ("And by changing that phone number, which has been something that we have done for years, and saying that this glass shop doesn't understand that is ridiculous, because this has been the way it's been for as long as I've been there, which has been over a decade. So they knew when they changed that phone number and when they changed that address that this was going to create that kind of problem.") (deposition testimony of Teresa Ann McCaslin-Bedell). Plaintiffs also provide facts suggesting that Defendants billed them for glass replacement services at a rate standard for Florida — higher than those charged in Arizona — thus perpetuating the misrepresentation. Docs. 169 at 7, 171-1 at 5-6.

Defendants point to many instances in which they told Plaintiffs that repair services were being done in Arizona, but these statements are less relevant if they knew, as Plaintiff suggests, that the rate-determining facts were the billing address and phone number. There exists a material dispute of fact as to whether Defendants knew how Plaintiffs would determine service location, and if they intentionally exploited Plaintiffs system to their own benefit. Weighing this competing evidence is a task properly left to the jury.

Further, if it is true that shop address and phone number are the industry standard for setting service location, a jury could find that Plaintiffs reasonably relied on Defendants' answers to these questions in determining service location. Prior to the cease-and-desist letter, a jury could find that Plaintiffs reasonably relied on long-standing industry practice. *See Cramton v. Grabbagreen Franchising LLC*, No. CV-17-04663, 2019 WL 7048773 at *32 (D. Ariz. Dec. 23, 2019), *aff'd*, No. 21-17122, 2023 WL 5036489 (9th Cir. Aug. 8, 2023) (whether plaintiff was reasonable in relying on seller's statement that

8

planned sale had fallen through despite knowledge that the company wanted a quick deal and his ability to fact-check the statement with others was "a quintessential jury question"); *Lerner*, 322 P.3d at 915 (whether homebuyer would reasonably rely on seller's representation about their reason for moving was question properly left for the jury). Accordingly, the Court will deny Defendants motion for summary judgment on Plaintiffs fraud, civil conspiracy, and RICO claims to the extent they are based on insurance claims paid prior to April 25, 2018.

### 2. After the Cease-and-Desist Letter.

Defendants argue that even if Plaintiffs can show the necessary elements of falsity and intent, Plaintiffs cannot prove they reasonably relied on Defendants' statements after they sent Defendants a letter complaining that the information Defendants were providing was misleading. Doc. 160 at 15-16. The Court agrees.

The April 25, 2018 letter from Plaintiffs' counsel demanded that Defendants stop providing a shop telephone number on FNOL calls that was located in a different state than where the glass replacement service was being completed. Plaintiffs stated that they have "call recordings establishing that [] representatives are providing the telephone number of an associated shop that is not the shop performing the work." *Id.* at 2. The letter also makes clear Plaintiffs believed this to be a "misrepresentation" that was resulting in higher payments than would otherwise be issued. *Id.* at 2-3.

The cease-and-desist letter establishes — as an undisputed fact in this case — that Plaintiffs knew by at least April 25, 2018 that Defendants were providing phone numbers in states different from where the service was being performed, and that Plaintiffs understood the financial consequences of relying on those numbers. Plaintiffs also knew that Defendants did not stop this practice after receiving Plaintiff's letter, as evidenced by follow-up letters Plaintiffs sent Defendants in 2019 renewing the demand, and the fact that Plaintiffs eventually changed their claims-payment system to accommodate Defendants' practice of using Florida numbers. Thus, even if providing such numbers was a misrepresentation given practices in the industry, Plaintiffs knew this was happening as of

9

April 25, 2018 and could not thereafter reasonably rely on the numbers as showing where service was performed.

Plaintiffs argue that their continued reliance was reasonable because changing their internal system to accommodate Defendants' use of the Florida numbers would have been time-consuming and expensive, and would have risked overlooking legitimate Florida-based claims. Docs. 170 ¶ 37, 170-2. But the Court cannot conclude that a party which knows that a phone number does not accurately represent the location of service can nonetheless rely on it for the location simply because making internal business adjustments would be difficult. Nor can the Court conclude that such a party can later claim to have been defrauded into relying on the number. Put simply, Plaintiffs could not reasonably rely on Florida numbers they knew did not represent the location of service.

What is more, Plaintiffs provide no evidence to show that internal change would have been difficult. At oral argument, Plaintiffs highlighted deposition testimony from Micaela Rush that Plaintiffs were forced to manually update the service location until a more permanent fix could be made. Doc. 170-2 at 124-26. But this merely proves that a manual fix was possible, and says nothing about whether it was time-consuming, expensive, or risky. *Id.* Plaintiffs also pointed to testimony of Teresa Ann McCaslin-Bedell that Plaintiffs chose to send cease-and-desist letters because they were unsure how to make the change within their own IT system. *Id.* at 76. But continuing to pay claims while sending demand letters, rather than stopping payments or finding an internal business fix, was itself a business choice of Plaintiffs. Having knowingly chosen to pay claims on the basis of numbers they knew were not reliable indications of location, Plaintiffs cannot reasonably claim that they were defrauded into relying on the numbers. *Id.* at 86. The Court will grant Defendants' motion for summary judgment on Plaintiffs' fraud, civil conspiracy, and RICO claims to the extent they are based on insurance claims paid after April 25, 2018.

/ / /

/ / /

**B.     Unjust Enrichment (Count V).**

Plaintiffs argued at the hearing that their unjust enrichment claim should survive in full, even if their fraud-based claims fail after April 25, 2018. The unjust enrichment claim is based on the allegation that Defendants "falsely represent[ed] the geographical location of auto glass repairs and/or replacements," which required "Farmers to pay substantially more than they otherwise would have in the absence of Defendants' false representations." Doc. 1 ¶¶ 96, 98. At oral argument, Plaintiffs' counsel explained that the claim is premised on Defendants' acceptance of payment at a higher rate than would have been acceptable for services rendered in Arizona. They say Defendants were notified during the FNOL calls as to what an estimated Arizona service rate would be, and yet billed for services at a higher rate than would be appropriate for an Arizona glass replacement. By accepting payment at a rate above the quoted Arizona rate, Plaintiffs allege that Defendants were unjustifiably enriched.

To establish an unjust enrichment claim in Arizona, "a plaintiff must demonstrate that the defendant received a benefit, that by receipt of that benefit the defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were such that in good conscience the defendant should provide compensation." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) (citing *Murdock-Bryan Constr., Inc. v. Pearson*, 703 P.2d 1197, 1202 (1985). More specifically, a plaintiff must show: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law. *Freeman*, 245 P.3d at 936. Defendants appear to dispute whether Plaintiffs can establish the first four elements.

Unjust enrichment focuses on the equity of the amount paid for a service, returning an excess that was not justified by the transaction. The claim does not include a reasonable reliance element like fraud. In this case, a dispute of material fact exists as to whether Plaintiffs were impoverished and Defendants enriched by payment of higher-than-average insurance reimbursements. Plaintiffs' expert Keith Beveridge will testify that insurance

1  companies often pay higher prices for auto glass in Florida, and that Defendants were
2  charging Plaintiffs rates that exceeded the competitive rates charged by auto glass shops in
3  Arizona.  Doc. 170-1 at 5-12.  At oral argument, Plaintiffs' counsel also suggested that the
4  disparity between estimated reimbursement figures provided during the FNOL calls, which
5  were premised on the service being completed in Arizona, and the actual reimbursement
6  Defendants received, shows that Defendants received higher than average amounts for their
7  glass replacement services.

8       Because Defendants have not shown as a matter of law that no jury reasonably could
9  find that unjust enrichment occurred, the Court will deny Defendants motion as to
10  Plaintiffs' unjust enrichment claim.

11       At oral argument, Defendants' counsel suggested that the voluntary payment
12  doctrine would prevent Plaintiffs from succeeding on their claims for the time period after
13  Plaintiffs knew Defendants' conduct was causing them to pay higher reimbursement rates.
14  Defendant did not base its motion on this doctrine or provide any relevant legal authority.
15  Because Defendants bear the initial burden of proof on their summary judgment motion,
16  the Court will not grant summary judgment on this basis.

17  **IV.**   **Plaintiffs' Rule 702 and Summary Judgment Motion.**
18       **A.**   **Rule 702 and *Daubert* Standards.**
19       Under Rule 702, an expert may offer "scientific, technical, or other specialized
20  knowledge" if it "will assist the trier of fact to understand the evidence or to determine a
21  fact in issue," provided the testimony rests on "sufficient facts or data" and "reliable
22  principles and methods," and "the witness has reliably applied the principles and methods
23  to the facts of the case." Fed. R. Evid. 702(a)-(d).  As made clear in recent amendments to
24  Rule 702, the proponent of expert testimony must show by a preponderance of the evidence
25  that the proposed testimony satisfies each of the rule's requirements.  *See* Fed. R. Evid.
26  104(a); Fed R. Evid. 702 Advisory Committee's Note to 2023 Amendment ("[T]he rule
27  has been amended to clarify and emphasize that expert testimony may not be admitted
28  unless the proponent demonstrates to the court that it is more likely than not that the

proffered testimony meets the admissibility requirements set forth in the rule."). The trial court – not the jury – applies this standard, acting as a gatekeeper to ensure expert testimony satisfies Rule 702 and therefore "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n. 2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence"). The Court's task is not to decide whether the expert is right or wrong, only whether her proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013).

### B. Motion to Preclude Defendants' Expert.

Defendants disclosed Gary Hart as an expert to testify about prevailing competitive pricing for automotive glass repair and replacement services. Mr. Hart prepared an expert report setting forth his assessment of Defendants' pricing and discussed the same in a June 2023 deposition. Docs. 179-1 at 15, 159-4. Plaintiffs move to exclude his opinions under Rule 702, arguing that he lacks sufficient knowledge to qualify as an expert in automotive glass repair pricing, does not have a sufficient factual basis to offer opinions, and did not apply reliable principles or methods in his analysis. Doc. 158.

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1268 (9th Cir. 1994); *see also* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). But "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment.

Defendants base Mr. Hart's qualification on his "over 20 years of experience in the Automotive Glass Repair and Replacement [] Industry." Doc. 179-1 at 2. This experience includes his time developing the billing software eDG, a seven-year period in which he was co-located with a glass repair shop, his role as Executive Director of the Independent Glass Association, and his attendance at industry trade shows and educational events during which he discussed glass repair and replacement pricing with repair shop owners. Docs. 171 at 4-7, 179-1 at 2-3. Though Plaintiffs contend this experience is insufficient to make Mr. Hart an expert in automotive glass pricing, Mr. Hart's time developing eDG and his industry experience give him the requisite background to serve as an expert on repair glass pricing. *See* Doc. 179-1 at 2.

But while his background generally qualifies him to offer expert testimony on Arizona automotive glass repair pricing, Mr. Hart must still outline what specific experience he is relying on in forming his opinions and why this experience is a sufficient basis for his conclusions regarding prevailing competitive pricing. Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment. Courts are not required to guess whether an expert has relied on sufficient facts or data. "[E]xperts must explain the basis for their conclusions in a manner that allows the Court to determine whether they are using reliable principles and methods and are applying them to the facts of the case in a reliable manner." *Davis*, 2019 WL 3532179, at *4. Although "experts commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Mr. Hart testified to the following prevailing competitive price ranges for windshield replacement service components:

- Windshield Glass – NAGS plus 10% to 50% or OEM MSRP
- Labor – $80 to $150 per NAGS Labor hour.
- Repair Labor – $75 to $115 per repair.
- Kit – $30 to $90 depending on vehicle make (domestic vs. foreign and need for calibration.

14

Doc. 1791-1 at 15. After comparing these ranges to those charged by Defendants, he finds Defendants were invoicing Plaintiffs for prices "within the established range of prevailing competitive prices." *Id.*; Doc. 159-4 at 149-50.

In support, Mr. Hart explains that "[i]n my own analysis of the usual and customary charges for glass repair/replacement services provided by perceived known Non-Affiliate/Non-Network service providers in the Greater Phoenix/Maricopa area, I have confirmed what I already knew to be true based on my years of experience in this industry." Doc. 179-1 at 15. Mr. Hart's report makes several references to this "analysis." *See e.g.*, *id.* ("I am aware of the components that go into pricing for glass services, and I was able to conduct my analysis which confirmed my opinions[.]"); *id.* at 16 ("Based on my years of experience in the industry, and my familiarity with glass pricing and the various components that go into pricing, I was aware that the prevailing competitive prices for glass services fell within a range, which was confirmed by my analysis."). But Mr. Hart's report never describes this analysis, what it entailed, or what it found. He states that he analyzed "the local physical market" in the region and relied on his "background and many years of experience in the industry," but he never describes the local market or what it disclosed, or what he learned about prices from his years on the industry. *Id.* at 15-16. One reads his report in vain for any indication of the facts and data on which he relied or the methodology used in his analysis.

Mr. Hart's deposition provides no clarity. When asked if he completed an analysis of whether the invoices issued by Defendants were at the prevailing competitive price, he admitted that he did no analysis — that he "just believe[s]" they are. Doc. 156-4 at 150. He confirms this repeatedly, concluding that he finds "[the prices] to be reasonable, only based off of my beliefs." *Id.* at 152.

Mr. Hart does indicate that he relied on past conversations with glass shops regarding their pricing, but could not provide any more detail when questioned:

> A: But, again, what I mean by my analysis is what has been brought to my attention by talking with other glass shops, who have told me they are a non-network or non-affiliated –

15

> Q: What glass shops?
>
> A: It's been over – since 2001, of all these years. I don't specifically remember the names of the individuals or the shops.
>
> Q: Can you remember any of the shops?
>
> A: Off the top of my head, no.
>
> Q: What other analysis did you do, other than talking to some shops?
>
> A: Other than talking to shops, that's it, no other analysis.

*Id.* at 155-56.

Mr. Hart offers no more explanation for his opinions than his general experience in the industry, coupled with vague references to conversations he's had over years.[4] He does not sufficiently explain how his experiences led to the prevailing competitive price ranges he identified, why this was a sufficient basis for his opinions, or how these experiences were reliably applied to the facts. *See Davis*, 2019 WL 3532179 at *4, 27; Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendment. His opinions that Defendants were charging a prevailing competitive price are based only on "the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Because Defendants have not shown by a preponderance of the evidence that Mr. Hart's opinion meets the requirements of Rule 702, his opinion is not admissible.

**C.     Motion for Summary Judgment.**

In tandem with their motion to preclude Mr. Hart's expert report, Plaintiffs move for partial summary judgment on the counterclaims. Doc. 158. Defendants assert counterclaims for (1) breach of contract, (2) breach of duty of good faith and fair dealing, and (3) unjust enrichment premised on Plaintiffs' underpayment of 689 invoices issued by Defendants. Doc. 28 at 18-20. Plaintiffs assert that the full amounts billed by Defendants

---

[4] Defendants argue that Mr. Hart relied on glass pricing standards used in Minnesota, which are National Auto Glass Standards (NAGS) pricing with a 20% markup ("NAGS + 20%"). Doc. 171 at 7-9. But Mr. Hart does not explain what experiences lead him to believe the Minnesota model is a nation-wide standard or why this model is a sufficient basis for his opinion about Arizona rates. Moreover, the Minnesota model only addresses the price of glass, not the other three pricing elements Mr. Hart opines on, and does not explain why Mr. Hart provided a range of prevailing glass prices (NAGS plus 10% to 50% or OEM MSRP).

16

exceeded fair and reasonable market rates. Plaintiffs argue that without the testimony of Mr. Hart, Defendants have no evidence with which they can support their claim that they were invoicing Plaintiffs at the proper amount, an essential element for all three of their counterclaims. *See* Doc. 158 at 11-12.

Despite the exclusion of Mr. Hart's testimony, the Court will deny Plaintiffs' summary judgment motion. Defendants have other evidence to support their claim that they were invoicing reasonable rates, including (1) evidence that Bristol-West, a Farmer's subsidiary, was paying Defendants the NAGS + 20% rate, (2) deposition testimony from Jeff Searles regarding payments they receive from other insurance companies, and (3) deposition testimony from Plaintiffs' employees Michaela Rush and Teresa McCaslin-Bedell that when charged prices are disputed through an appraisal process, automotive shops routinely receive more money than Plaintiff has initially paid. Doc. 171 at 11-12; *see* Docs. 172-2 at 3 (testimony of Jeff Searles); 172-6 at 3 (testimony of Bristol-West employee Timothy Cerar); 172-7 at 6 (testimony of Michaela Rush); 172-8 at 4 (testimony of Teresa McCaslin-Bedell).

The Court is not persuaded by Plaintiffs' argument that Defendants are limited to the use of Mr. Hart's testimony because of statements made during the December 15, 2022, discovery dispute hearing. As Defendants note, this dispute concerned whether Plaintiffs were entitled to discovery of Defendants' internal costs of doing business. Docs. 171 at 12-13; 159-1. Defendants argued that discovery into such business expenses was not relevant because their arguments regarding reasonable market rates would be based on market-wide factors, not on business expenses such as labor or material costs. Doc. 159-1 at 47. Defendants do not now propose to use the business expenses that were foreclosed in the discovery dispute, and nothing in the dispute process limited them from using other kinds of evidence. Because Defendants have evidence to support their claims in addition to Mr. Hart, the Court will deny the Plaintiffs' motion for summary judgment.

/ / /

/ / /

**IT IS ORDERED**:

1. Defendants' motion for summary judgment (Doc. 160) is **granted in part** and **denied in part** as set forth in this order.

2. Plaintiffs' Rule 702 and summary judgment motion (Doc. 158) is **granted in part and denied in part**. Defendants are precluded from offering the expert testimony of Mr. Gary Hart, but Plaintiffs' request for summary judgment on Defendants' counterclaims is denied.

3. The Court will schedule a hearing to set dates for trial and a final pretrial conference.

Dated this 25th day of March, 2024.

*David G. Campbell*
David G. Campbell
Senior United States District Judge